IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JUDY ROSE NORMAN-NUNNERY,

              Plaintiff,

      v.

MADISON AREA TECHNICAL COLLEGE,
CAROL BASSETT, WILLIAM STRYCKER and
JACKIE THOMAS,

              Defendants.

OPINION AND ORDER

08-cv-320-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In 2005, plaintiff Judy Rose Norman-Nunnery applied for a position with defendant Madison Area Technical College. She did not receive an interview. She brought this suit under Title VII of the Civil Rights Act, 42 U.S.C. §§ 1981 and 1983, contending that the college and defendants Carol Bassett, William Strycker and Jackie Thomas refused to interview or hire her because she is African American and because they dislike her husband. Because plaintiff has adduced no evidence from which a jury could reasonably find that either of these reasons motivated defendants' decision, I must grant defendants' motion for summary judgment.

From the parties' proposed findings of fact and the record, I find that the following

1

facts are undisputed.

## UNDISPUTED FACTS

### A.  Plaintiff's Background

Plaintiff Judy Rose Norman-Nunnery is African American.  She received a doctorate from the University of Wisconsin–Madison in education, continuing and vocational; she has a master's degree from Louisiana Tech University in home economics education with a minor in educational administration.

From 1984 to 1987, plaintiff was the vocational education coordinator for the Milwaukee Public Schools.  From 1987 to 2003, she worked in state government, first as the administrator for the Department of Health and Human Services and then as the administrator for the Workers' Compensation Division and the Division of Vocational Rehabilitation in the Department of Workforce Development.  These are all managerial positions.  (In her proposed findings of fact, plaintiff goes into great detail about her administrative, technical and supervisory responsibilities and knowledge at these jobs.  Plt.'s PFOF, ¶¶30-62 dkt. #40.  Because defendants' stated reasons for declining to interview plaintiff are unrelated to her experience in these areas, it is unnecessary to discuss those facts.)

2

B.  Jimemez Lawsuit and Previous Application

Since 1982 plaintiff has been married to Willie Nunnery, a lawyer.  In 2000, plaintiff's husband represented Elvira Jimenez in a race discrimination suit against defendants Madison Area Technical College, Carol Bassett, Jackie Thomas and William Strycker.  Defendant Madison Area Technical College is a public institution with its main campus located in Madison, Wisconsin;  Thomas, Strycker and Bassett were employees at the college.  Each knew that Nunnery was the lawyer for Jimenez.  This court dismissed the case as frivolous.  At a sanctions hearing, Strycker testified that he was "hurt" and "upset" by the lawsuit. Bassett was "upset" by the lawsuit because Jimenez forged her signature and alleged that she had made racial slurs.

In 2002, plaintiff applied for a position with the college as the executive dean of learning.   In an email, defendant Thomas "nominated" four possible candidates for the position; plaintiff was not among them.  Although plaintiff made it through the initial screening process, she was not interviewed for the position.   In a document created by the college that lists the candidates for the position, their sex and race, plaintiff is identified as "black."

C.  Plaintiff's Application for Disability Resources Services Administrator

In the spring of 2005, a new position was created at the college for a "disability

resource services administrator."  The job posting listed the minimum qualifications for the position, including a master's degree and at least 4,000 hours of administrative experience. The job description summarized the responsibilities of the position as follows:

> Direct the daily operation, activities and staff of Disability Resource Services across the MATC district.  Plan, develop, implement, monitor and assess programs and services meeting the requirements of Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act for eligible students with disabilities. Promote and support the success of students with disabilities emphasizing the development of the whole person with the student's learning experience.

The description did not list "direct" experience with disabled persons or experience in a higher education setting as job requirements.

Bob Wynn, a minority recruiter for the college, contacted plaintiff about the position and told her that he believed she would be a good candidate for the job.  At Wynn's suggestion plaintiff called Eugene Fujimoto to discuss her qualifications. Fujimoto was the college's "Diversity Coordinator/Affirmative Action Officer" and responsible for monitoring the hiring process for fairness.   Fujimoto told plaintiff that her administrative experience would be helpful "due to some issues internally in the disability resource services unit that needed to be addressed."

Plaintiff applied for the position along with 76 other applicants.  Defendant Carol Bassett, the college's employment and benefits administrator for the human resources department, conducted an initial screening to determine which applicants met the minimum

qualifications.  This review reduced the applicant pool to 46 candidates, including plaintiff.

The college employed a selection committee to determine which of the remaining 46 candidates would be selected for an interview.  The committee had five members, including Kevin Carini, Beth Bremer, Marilyn Fayram and Carol Higgans; defendant Jacquelyn Thomas was the chairperson.

In a training session with Kristine Gebhardt, committee members used the position description to develop five "depth and breadth" criteria to screen candidates and assigned maximum point values for each of them:  (1) experience with higher education (two points); (2) experience with adult persons with disabilities (three points); (3) knowledge of current and emergent technologies for persons with disabilities (one point); (4) supervisory experience (two points); and (5) "experience with providing reasonable accommodations in an educational setting" (three points).  These criteria were created before the applications were screened.

After each of the 46 remaining applicants was scored independently by each committee member, members discussed the rationale for their scores until the committee reached consensus.  Defendant Thomas recorded the consensus score on her screening form.

The committee selected ten candidates for interviews; plaintiff was not among them. Under the college's "EEO goals," three or more minority candidates had to be in the interview pool.  Higgans had not brought the "affirmative action sheet" that identified the

5

applicants' race, so she retrieved it from the human resources office.   A review of that sheet revealed that the committee had chosen only one minority candidate, an African American woman.  Higgans informed the committee that plaintiff was African American, but it chose two other minority candidates for interviews instead:  an Asian male and a Hispanic female, who had the next two highest scores among the people of color.

After a first round of interviews, the pool was reduced to three candidates, none of whom was a minority candidate.  Defendant William Strycker (vice president of human resources) and Carol Higgans were approached by Fujimoto.  Until then, Strycker was not aware that plaintiff was African American.  Bassett learned that plaintiff was an African American "around" the same time.

Fujimoto was concerned that plaintiff had not been given an interview.  Higgans told Fujimoto that plaintiff was not chosen because she scored lower in the "higher education" and "experience with adult PWD" criteria than the selected applicants.

Defendant Strycker arranged a second meeting to discuss Fujimoto's concerns. Defendants Thomas, Bassett and Strycker were there, along with Fujimoto and Higgans. Fujimoto told the others that plaintiff had "a high level of administrative experience" and "an excellent background and that she had been recruited specifically for the position;" he was concerned that she had not been chosen "despite her minority status and excellent qualifications for the . . .  position."   Fujimoto said that he believed plaintiff "had a lot of

6

experience on her application" but that she had not used "the right words" to move through the screening process. He believed that they could make "assumptions" about her experience from her résumé and that "there may be specific items in her experience that they would learn if they had interviewed her." In addition, Fujimoto questioned the validity of some of the "depth and breadth" requirements.

Higgans repeated to Fujimoto that plaintiff had not received an interview because her scores on "higher education" and "experience with adult PWD" criteria were lower than the other candidates, including the two minority candidates selected after the end of the first round of screening. When defendant Strycker asked whether anyone believed that discrimination had a played a role in plaintiff's failure to be selected, no one said it had. Strycker decided not to interview plaintiff; Higgans and Bassett agreed.

In response to an inquiry from plaintiff, Fujimoto wrote to her, explaining that she did not receive an interview because "there were other candidates scoring slightly higher in some categories. Thus, while you were a strong candidate, there were applicants who were stronger for this position. Of note is your extensive supervisory experience, while you were deemed to be less strong in higher education experience and direct experience with people with disabilities."

After a second round of interviews, a white woman, Sandra Hall, was selected for the position. (Defendants do not say in their proposed findings of facts who made the final

7

decision).  Hall had 30 years of experience in the "disability field," a master's degree in a "disability-related field," three years of experience at the University of Wisconsin–-Whitewater supervising disability services, "experience with mental health" and "good" knowledge of assistive technology.   Hall had been a member of plaintiff's staff at the Division of Worker's Compensation.

When Bassett and Strycker first saw plaintiff's name in the applicant pool, they did not know any Nunnerys in Madison other than Willie Nunnery.  (The parties do not say when Bassett and Strycker first saw plaintiff's name.)  "At some point," Bassett became aware that plaintiff was Willie Nunnery's wife and she "may have" talked to Strycker and Thomas about this.  Bassett said something like "Oh, she is Willie Nunnery's wife."

Fujimoto was responsible for compiling the college's report on affirmative action hiring and retention efforts.  In Fujimoto's research he discovered that, for the ten years leading up to 2005, between six and seven percent of administrators at the college were persons of color; this represented a decrease in representation from the previous ten-year period.  He conducted a "nonexperimental study" isolating the "depth and breadth" criteria and their effect on hiring at the college.  He concluded that race affected the college's hiring decisions, including the decision not to interview plaintiff, "on a structural level" because the college used an "insider-favored system."  For example, he noted that most full-time faculty position were filled with members of the part-time faculty and that 95% of the part-time

8

faculty members were white.

### D.  Missing Documents

In 2005, the college was still using paper applications.  After the college filled the position for disability resources services administrator, all of the screening forms and scores were placed in a "job file," in accordance with policy at the time.  The applications for a particular position were stored separately from each other and from the screening documents.  Instead, they were filed on the basis of "category of position, year of application and then alphabetically by the applicant's last name."  These documents are stored for 10 to 15 years.  However, before being filed, the applications were placed on tables on stacks as high as three feet.  Various employees are responsible for filing applications, including student employees.

The human resources department moved in June 2005 and December 2005 to accommodate office remodeling.  All the applications in the office had to be boxed and shipped for both of these moves.

By the time of plaintiff's hearing before the Equal Rights Division in 2006, 26 of the applications for the administrator position were missing, including plaintiff's application and the applications of everyone offered an interview except Sandra Hall. (Once she was chosen for the position, her application materials were moved to her personnel file.) Also missing

9

is Thomas's screening form containing the consensus scores.  The last time anyone can recall seeing plaintiff's application and Thomas's depth and breadth screening form, Fugimoto had them during the meeting between Fugimoto, Bassett, Thomas, Strycker and Higgans. However, Fujimoto believes that he returned these materials to the human resources office. Despite an "exhaustive" search by various employees, the application materials have not been found.

When the Equal Rights Division requested the application and screening materials, a lawyer for the college wrote, "[t]he Complainant's application materials were with Mr. Eugene Fujimoto when he investigated her concerns.  Mr. Fujimoto has left the college and her material is not available."  Strycker reviewed this response and testified at the hearing that he did not observe any inaccuracies in it despite his knowledge that Fujimoto stated that he had returned to the college all the application materials he had taken.

OPINION

Plaintiff contends that defendants did not interview or hire her for the administrator position because she is an African American and because she is married to Willie Nunnery, who was the attorney for a woman who had sued defendants for race discrimination in 2000. Plaintiff's claim for race discrimination is one that is well recognized under the equal protection clause, Title VII and 42 U.S.C. § 1981.  The law is much less clear regarding the

10

viability of a claim for discrimination because of a marital relationship.  Although courts have long recognized that marriage is a fundamental right protected by the Constitution, e.g., Loving v. Virginia, 388 U.S. 1 (1967); Zablocki v. Redhail, 434 U.S. 374 (1978), courts have not reached a consensus on the scope of this right in the context of the work place. E.g., Adler v. Pataki, 185 F.3d 35, 44 (2d Cir.1999) (concluding that right of association in work place arises under First Amendment rather than due process clause and suggesting that Pickering balance might be appropriate but it was unnecessary to decide because record did not show that spouse's conduct "threatened the proper functioning" of government); Singleton v. Cecil, 133 F.3d 631, 635 (8th Cir.1998) (concluding that plaintiff could not prevail on claim for violation of right to intimate association because city's termination of plaintiff "on the basis of his wife's conduct simply did not substantially or directly interfere with Singleton's right to enter and maintain his marital relationship"); McCabe v. Sharrett, 12 F.3d 1558 (11th Cir.1994) (concluding that employee had right of intimate association in work place and noting several different standards of review but declining to choose one because plaintiff could not satisfy any of them); Adkins v. Board of Education, 982 F.2d 952 (6th Cir.1993) (concluding that right of association exists in work place, that standard was whether plaintiff was subjected to "undue intrusion" of marital relationship and that standard could be satisfied by termination of employment because of marriage). See also Balton v. City of Milwaukee, 133 F.3d 1036, 1032 (7th Cir.1998) (stating that

11

Connick-Pickering test would not fit "some associational choices—for instance, whom to marry"—that are purely private matters because it would not be possible to establish that employee's conduct addressed matter of public concern); <u>Yasiri v. Board of Regents of University of Wisconsin System</u>, No. 99-C-51, 2000 WL 34230253, *12 (W.D. Wis. Jan. 28, 2000) (noting that other courts had applied right of intimate association in work place but declining to determine its application because plaintiff could not prove that she lost tenure because of her marriage).

Regardless of the scope of plaintiff's rights or the appropriate standard of review to apply, she cannot prevail on either of her claims unless she has evidence that defendants declined to interview her because of her race or because of her marriage.  Because I conclude that she has not satisfied this requirement of her claims, I need not consider any other issue.

A plaintiff in a discrimination or retaliation case may prove her claim directly with evidence suggesting that the illegal factor motivated the defendants' decision or indirectly by showing that the defendants' reasons for taking an adverse act are not worthy of belief. <u>Faas v. Sears, Roebuck & Co.</u>, 532 F.3d 633, 641 (7th Cir. 2008).  Regardless of the method of proof, the ultimate question is the same:  whether a reasonable jury could find that the defendants discriminated against or retaliated against the plaintiff.  <u>Simple v. Walgreen Co.</u>, 511 F.3d 668, 670-71 (7th Cir. 2007).

Plaintiff falters at the starting gate because she fails to adduce any evidence that any

12

relevant decision maker knew her race or her marital status when she was eliminated from the pool of candidates.   For any claim in which motive is an element, a threshold requirement is that the plaintiff must prove that defendants were *aware* of the characteristic that allegedly provided the impetus for discrimination.   Plaintiff adduces no evidence that her marriage to Willie Nunnery was apparent from her application and, although plaintiff identified her race in her application materials, it is undisputed that the five employees screening plaintiff's application did not have this information while they were scoring each of the candidates.   Thus, at the point that plaintiff fell out of the running, it is simply not possible that plaintiff's race or marriage played a part in that decision.

Plaintiff argues that defendant Thomas was aware of her race because Thomas was involved in the hiring decision for another position for which plaintiff applied in 2002. However, the facts show only that Thomas nominated several candidates for consideration; plaintiff points to no admissible evidence that suggests Thomas ever reviewed plaintiff's application in 2002, much less that Thomas reviewed documents showing that plaintiff was black.   Similarly, the only evidence that anyone was aware of plaintiff's marriage during the committee's initial screening is Thomas's testimony that Willie Nunnery was the only other Nunnery that she knew when she reviewed plaintiff's application.   However, Thomas denies that she connected plaintiff with Willie Nunnery at the time.   I cannot conclude that simply sharing an uncommon last name would be enough to permit a reasonable jury to find that

13

Thomas must have believed the two were married.  <u>Davis v. Carter</u>, 452 F.3d 686, 697 (7th Cir. 2006) ("[W]hen the evidence provides for only speculation or guessing, summary judgment is appropriate.")

Even if I were to assume that Thomas was aware of plaintiff's race or marriage and that she harbored animus against plaintiff for one of these reasons, this would not necessarily provide much help to plaintiff.  Thomas was only one of five members on the selection committee; plaintiff does not propose any facts to suggest that any of the other four members had an illegal motive for rejecting her application.  Although plaintiff does not have to show that all of the committee members or even a majority of them held discriminatory beliefs, at the least she must adduce evidence that Thomas held influence over the other members.  <u>Haka v. Lincoln County</u>, 533 F. Supp. 2d 895, 914-15 (W.D. Wis. 2008); <u>cf.</u> <u>Brewer v. Board of Trustees of University of Ill.</u>, 479 F.3d 908 (7th Cir. 2007) (discriminatory intent of nondecision maker with "singular" or "significant" influence may be imputed to decision maker).  Plaintiff does not suggest that Thomas had such influence; rather, it is undisputed that the committee chose the initial ten candidates for interviews through "consensus scoring."

The committee members did not learn plaintiff's race until *after* plaintiff was eliminated and they determined that they had not chosen enough minority candidates to meet the college's diversity goals.  It is somewhat odd to argue, as plaintiff appears to be

14

doing, that defendants discriminated against her in the context of giving her application a second chance *because* she is a person of color, an opportunity that most of the other rejected candidates did not receive.  After reviewing the applications from minority candidates a second time, the committee chose to interview an Asian and a Latino candidate on the ground that they had the next highest "depth and breadth" scores.  Thus, to prove discrimination at this point in the process, plaintiff would have to show that defendants preferred an Asian or Latino candidate over an African American and that they manipulated the scoring or lied about it so that plaintiff would not be selected.

The problem with this theory is that plaintiff has adduced no evidence to support it. To begin with, it seems counterintuitive to say that the committee believed that it was unacceptable to choose plaintiff because she is an African American when the committee *did* choose another African American woman to be interviewed.  If the committee members were so opposed to plaintiff's application that they were willing to doctor the scores to exclude her, why would they have not done the same thing to the other African American woman whose scores qualified her for an interview? (The answer to this question cannot be plaintiff's marriage because the committee members still had not learned about her marital status.)

Also, plaintiff does not dispute the committee's ground for not choosing her, which is that she  lacked experience in higher education and direct experience working with people

15

with disabilities.  Plaintiff attempts to challenge the validity of these considerations by pointing out that they were not listed in the job description.  This gets plaintiff nowhere because it is undisputed that these criteria were adopted by the committee *before* members screened the candidates and thus before they knew plaintiff's race or marital status.  It makes little difference whether the criteria are a fair reflection of the position description or whether the criteria are even reasonable unless plaintiff can show that the unreasonableness is linked to discriminatory animus.  As has been stated in countless decisions, anti-discrimination laws do not prohibit employers from being unreasonable.  E.g., Grayson v. O'Neill, 308 F.3d 808, 820 (7th Cir. 2002); Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000).

Plaintiff suggests (through Fujimoto's study) that the "depth and breadth" criteria and the college's hiring practices in general tended to favor white candidates "on a structural level," but this does not support her claim.  Even if I accepted Fujimoto's opinion, it would be relevant only to a claim under a disparate impact theory, which plaintiff is not asserting in this case.  To prevail on the claim she is asserting, plaintiff must show that defendants discriminated against her intentionally.  For similar reasons, it is not enough for plaintiff to show that persons of color are under-represented at the college.  Although statistical data may sometimes be relevant in a discrimination case, it sheds little light on any individual decision.  This is why the court of appeals has held repeatedly that simply showing a racial

16

disparity without accounting for other factors is not sufficient to defeat a motion for summary judgment.  Nichols v. Southern Illinois University-Edwardsville, 510 F.3d 772, 782-83 (7th Cir. 2007); Barricks v. Eli Lilly and Co., 481 F.3d 556, 559(7th Cir. 2007); Baylie v. Federal Reserve Bank of Chicago, 476 F.3d 522, 523-25 (7th Cir. 2007).

Plaintiff tries to explain her lack of evidence by blaming it on defendants.  She argues that the evidence she needs to prove discrimination would have been found in the missing application materials for the other candidates and the screening form Thomas used.  Relying on the spoliation doctrine, she says she is entitled to an inference that these documents would have supported her claims.

Plaintiff's argument fails for two reasons.  First, it is unclear how the missing application materials could do plaintiff much good.  Again, because the committee did not know plaintiff's race or marital status while they were screening the applicants, it would not necessarily be evidence of discrimination if the application materials showed that plaintiff was more qualified than some of the candidates who received interviews.  It would show only that the committee did a poor job of screening the applications.

Second, plaintiff has not met the demanding standard for proving spoliation.  When documents are missing, a party is not entitled to an adverse inference unless she can show that the other party "intentionally destroyed the documents in bad faith."  Faas, 532 F.3d at 644-45.  The undisputed facts show that the college's filing system in 2005 and 2006 was

17

extremely disorganized, that all of the human resources files were moved twice during the relevant time period and that Fujimoto was the last person to have been seen with at least some of the missing documents.  All of these facts suggest that the documents have been inadvertently lost rather than destroyed in an effort to hide harmful evidence.

The facts to which plaintiff points in support of a finding of spoliation are simply not persuasive.  It is not surprising that Sandra Hall's materials were not lost, because they were filed separately from the other applications.  It is not suspicious that the documents were lost sometime between Fujimoto's meeting with defendants and the Equal Rights Division hearing, because no one would have used the application materials during that time period. The college's lawyer's letter to the Equal Rights Division may have omitted some relevant facts by suggesting that Fujimoto had plaintiff's application materials without acknowledging that Fujimoto said that he believed he returned those documents.  However, the letter did not include any inaccurate statements.  It is not plausible to suggest that defendants must have destroyed the documents because their lawyer failed to explore all possible explanations for their loss. Tellingly, plaintiff cites no cases in support of her argument that a finding of spoliation would be appropriate in this case.

This leaves plaintiff's contention that defendants Bassett, Strycker and Johnson discriminated against her when they refused to interview her even after Fujimoto intervened on her behalf.  This argument is without merit.  By the time Fujimoto approached

18

defendants, the first round of interviews had already been conducted and the pool of candidates had been reduced to three.  Defendants were understandably reluctant to revisit decisions made by the committee.  Far from suggesting that defendants were acting in a discriminatory manner, their refusal to make an exception for plaintiff shows their concern for treating all candidates equally.  Even if altering the process might have been reasonable under some circumstances, Fujimoto did not provide defendants with any information supporting a view that plaintiff was being treated unfairly.  He did not contradict defendants' view that plaintiff did not have direct experience working with disabled people or experience in higher education.  Rather, he asked that they "assume" that she was qualified for the position until they interviewed her.  Again, by refusing this request, defendants simply treated plaintiff the same as every other candidate.

Because plaintiff has failed to adduce evidence that anyone involved in the hiring process wished to deny her an interview because of her race or marital status, I must grant defendants' motion for summary judgment.


ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Madison Area Technical College, Carol Bassett, William Strycker and Jackie Thomas is GRANTED.  The clerk of court is directed to enter judgment in favor of defendants and

19

close this case.

Entered this 5th day of March, 2009.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge